Gretchen Pack ROSE, as Executrix of the Estate of John W. Hubbard, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

C. A. No. 13875.

United States District Court
W. D. Pennsylvania.
May 14, 1957.

William Scott, Jr.; Lee W. Eckels, Pittsburgh, Pa., for plaintiff.

D. M. Anderson, Jr., U. S. Atty., Pittsburgh, Pa., for defendant.

McILVAINE, District Judge.

The Court finds the facts as stipulated by and between the respective parties to this action as follows:

Findings of Fact

1. Plaintiff at all of the times hereinafter mentioned was, and now is, the duly appointed, qualified and acting executrix of the estate of John W. Hubbard, Deceased (hereinafter referred to as the estate) and a resident of the City of Pittsburgh, Allegheny County, Pennsylvania, in this District.

2. The plaintiff brings this action against the United States of America to recover income taxes and interest thereon which the plaintiff claims were illegally assessed and collected by the defendant from the plaintiff. Plaintiff is a citizen of the United States, and jurisdiction is conferred upon this Court by 28 U.S.C.A. § 1346(a) (1).

3. Plaintiff's claim is for the recovery of income taxes assessed and collected from plaintiff in the principal amounts of $52,537.66 for the fiscal year ended May 31, 1949, $16,103.92 for the fiscal year ended May 31, 1950, and $11,536.24 for the fiscal year ended May 31, 1951, together with interest thereon.

4. On June 3, 1947, John W. Hubbard (hereinafter referred to as the decedent), a citizen of the United States and a resident of the City of Pittsburgh, Allegheny County, Pennsylvania, in this District, died testate.

5. On September 2, 1948, the plaintiff filed a Federal Estate Tax return with Stanley Granger (hereinafter referred to as the Collector) who at that time was the Collector of Internal Revenue for the Twenty-third Collection District of Pennsylvania and who is no longer in such office.

6. The said Federal Estate Tax return disclosed a total gross estate of $13,820,326.18 at date of death and a net estate for basic tax purposes of $10,833,-558.38. The net estate tax payable thereon was $5,544,670.61.

7. On September 17, 1948, the plaintiff filed with the Commissioner of Internal Revenue (hereinafter referred to as the Commissioner) a request for an early determination of the Estate's Federal Estate Tax liability.

8. On or about May 15, 1949, the Commissioner by his examining officer, Internal Revenue Agent L. J. Cheskey, commenced his examination of the Federal Estate Tax return filed for the estate.

9. On July 21, 1950, the Internal Revenue Agent in Charge of the Pittsburgh Division mailed to plaintiff a 30-day letter and enclosed therewith a copy of Internal Revenue Agent L. J. Cheskey's report of his examination, in which a deficiency of $2,300,901.82 in Federal Estate Tax was proposed.

10. On August 4, 1950, the plaintiff delivered a check to the Collector in the amount of $1,500,000 which sum was deposited at plaintiff's request in the Collector's 9–D Suspense Account in respect of the proposed deficiency referred to in Paragraph 9 hereof.

11. On August 28, 1950, the plaintiff filed a formal protest with the Internal Revenue Agent in Charge of the Pittsburgh Division wherein exceptions were taken to the adjustments and deficiency proposed in the 30-day letter of July 21, 1950 and the report of Internal Revenue Agent L. J. Cheskey attached thereto.

12. In the absence of an agreement with the Internal Revenue Agent in Charge as to the Estate's Federal Estate Tax liability, the case was transferred to the Internal Revenue Service's Technical Staff, Eastern Division. On July 9, 1951, the plaintiff offered to settle the said liability on the basis of a deficiency of $1,524,485.60 less a credit of $29,445.-62 for Canadian Succession Taxes when proven. On July 18, 1951, the Assistant Regional Commissioner, Appellate Divi-

516

sion, accepted the said offer of settlement on behalf of the Commissioner.

13. Pursuant to the terms of the settlement referred to in Paragraph 12 hereof, the Collector, on August 24, 1951, assessed against the estate a net deficiency in Federal Estate Tax in the amount of $1,495,039.98, being the agreed deficiency of $1,524,485.60 less credit for Canadian Succession tax in the amount of $29,445.62.

14. On August 28, 1951, the Collector issued a statement of Federal Estate Tax due in the amount of $167,215.34 computed as follows:

| | |
|---|---|
| Deficiency in Estate Tax | $1,495,039.98 |
| Interest 9–3–48 to 8–4–50 | 172,175.36 |
| Total | $1,667,215.34 |
| Less: | |
| Payment made 8–4–50 | 1,500,000.00 |
| Balance due | $ 167,215.34 |

15. The plaintiff paid the $167,215.34 referred to in Paragraph 14 hereof to the Collector on September 6, 1951.

16. In keeping the books of the estate, the plaintiff regularly used the accrual method of accounting and regularly computed the estate's taxable income for Federal Income Tax purposes on the basis of a fiscal year ending on the last day of May.

17. Plaintiff's United States Fiduciary Income Tax Return for the estate for the fiscal year ended May 31, 1949, was prepared on the accrual basis of accounting and was filed with the Collector on August 15, 1949, and plaintiff paid to said Collector the amount of Federal Income Tax liability shown to be due by said return, viz., $164,947.10, in the following amounts and on the following dates:

| | |
|---|---|
| August 15, 1949 | $41,236.78 |
| November 8, 1949 | 41,236.78 |
| February 15, 1950 | 41,236.78 |
| May 14, 1950 | 41,236.78 |
| | $164,947.10 |

18. The commissioner has caused to be refunded to the plaintiff with respect to the Estate's Federal Income Tax liability referred to in Paragraph 17 hereof the sums of $33,755.28, which was received on February 14, 1952, and $52.32, which was received on or about June 9, 1952, so that the net Federal Income Tax liability paid by plaintiff in behalf of the estate for the fiscal year ended May 31, 1949, is $131,139.50.

19. Plaintiff's United States Fiduciary Income Tax Return for the estate for the fiscal year ended May 31, 1950, was prepared on the accrual basis of accounting and was filed with the Collector on or about July 20, 1950, and plaintiff paid to said Collector the amount of Federal Income Tax liability shown to be due by said return, viz., $16,103.92 on July 20, 1950.

20. Plaintiff's United States Fiduciary Income Tax Return for the estate for the fiscal year ended May 31, 1951, was prepared on the accrual basis of accounting and was filed with the Collector on or about July 2, 1951, and plaintiff paid to said Collector the amount of Federal Income Tax liability shown to be due by said return, viz., $35,513.45 on July 2, 1951. The Commissioner has caused to be assessed to the plaintiff with respect to the estate's Federal Income Tax liability for the fiscal year ended May 31, 1951, the additional sum of $3,010.25, which was paid to the Director of Internal Revenue at Pittsburgh, Pennsylvania, on March 1, 1954, so that the total Federal Income Tax liability paid by plaintiff in behalf of the estate for such year is $38,523.70.

21. Plaintiff claims that the interest in the amount of $172,175.36 referred to in Paragraph 14 hereof accrued throughout the estate's fiscal years ended May 31, 1949, May 31, 1950 and May 31, 1951, in the following amounts. Defendant admits that interest computed at the rate of

6% per annum on a deficiency of $1,495,039.98 would amount to the sums set opposite the periods indicated in the tabulation below.

| Fiscal Year Ended May 31 | Period | Days | Percentage | x | Interest |
|---|---|---|---|---|---|
| 1949 | 9/3/48 to 5/31/49 | 270 | 38.571429 | x | $172,175.36 |
| | | | | | equals $66,410.50 |
| 1950 | 6/1/49 to 5/31/50 | 365 | 52.142857 | x | $172,175.36 |
| | | | | | equals $89,777.15 |
| 1951 | 6/1/50 to 8/4/50 | 65 | 9.285714 | x | $172,175.36 |
| | | | | | equals $15,987.71 |
| | | 700 | 100% | | $172,175.36 |

22. In computing the net income shown on the United States Fiduciary Income Tax Returns filed for the estate for the fiscal years ended May 31, 1949, May 31, 1950, and May 31, 1951, plaintiff did not claim a deduction for interest accruing during such taxable years on the estate's deficiency in Federal Estate Tax in the respective amounts set forth in Paragraph 21 hereof.

23. On June 20, 1952, within the time and manner prescribed by law, plaintiff duly filed with the Collector a claim for refund of Federal Income Tax for each of the fiscal years ended May 31, 1949, May 31, 1950, and May 31, 1951, in the respective amounts of $52,537.66, $16,103.92, and $11,536.24, with interest thereon as provided by law. Submitted herewith is a true and correct copy of each claim marked Exhibits "A–1", "A–2" and "A–3", respectively.

24. The claim for refund of Federal Income Tax filed for the fiscal year ended May 31, 1951, sets forth an alternative claim in the amount of $35,513.45 plus $3,010.25, or a total of $38,523.70.

25. The Commissioner rejected the claims for refund described in Paragraphs 23 and 24 hereof and on October 14, 1954, gave notice of such rejection to plaintiff by registered mail.

26. Plaintiff claims that the interest accruing on the Federal Estate Tax deficiency during the estate's fiscal years ended May 31, 1949, May 31, 1950, and May 31, 1951, in the respective amounts set forth in Paragraph 21 hereof, is properly deductible under § 23(b) of the Internal Revenue Code of 1939 [26 U.S.C.A. § 23(b)] in computing taxable net income for such years and that by reason of the plaintiff's failure to claim such deductions for such years and the Commissioner's refusal to allow plaintiff's claims for refund for such years, the taxable net income upon which Federal Income Tax was paid for each such years has been erroneously, unjustly and illegally overstated.

27. Plaintiff claims that, in the alternative, the interest on the Federal Estate Tax deficiency accrued on August 4, 1950, the date on which the $1,500,000 referred to in Paragraph 10 hereof was paid to the Collector, and is properly deductible under § 23(b) of the Internal Revenue Code of 1939 [26 U.S.C.A. § 23(b)] in computing the estate's taxable net income for the fiscal year ended May 31, 1951 and that by reason of plaintiff's failure to claim such deduction for such year and the Commissioner's refusal to allow plaintiff's alternative claim for refund for such year as set forth in Exhibit "A–3" hereto, the estate's taxable net income upon which Federal Income Tax was paid for such year has been erroneously, unjustly and illegally overstated.

28. The Suspense Account 9–D referred to in Paragraph 10 of the Stipulation of Facts heretofore filed in this proceeding was an internal bookkeeping

account maintained by Collectors of Internal Revenue for the purpose of recording identified remittances received with respect to additional taxes and/or interest that had been proposed or recommended for assessment but that had not been assessed.

29. On August 23, 1927, D. H. Blair, Commissioner of Internal Revenue, issued instructions to Collectors of Internal Revenue dealing with the use of the 9–D Suspense Account. A true and correct copy of said instructions, marked "Exhibit B–1", is attached hereto. Exhibit B–1 makes reference to Com. Mimeograph Coll. No. 3552. A true and correct copy of said Coll. No. 3552, marked "Exhibit B–2", is attached hereto.

30. On February 15, 1939, Guy T. Helvering, Commissioner of Internal Revenue, issued instructions to Collectors of Internal Revenue directing them to deposit, in the usual manner, any remittance apparently made in respect of a proposed deficiency in taxes not yet assessed and directing them to record the amount so remitted in the appropriate unclassified or suspense account. A true and correct copy of such instructions, designated A & C Coll. No. 4883, is attached hereto as "Exhibit B–3".

31. During the taxable years involved in this proceeding, the Collector of Internal Revenue for the 23rd Collection District of Pennsylvania at Pittsburgh, pursuant to the Commissioner's instructions referred to hereinabove, would accept remittances received in respect of proposed or recommended assessments of additional tax. Accounting entries would record such remittances by a debit of the Collector's record of receipts and a credit to a 9–D Suspense Account in the name of the remitter. The remittance would be actually deposited in the Federal Reserve Bank of Cleveland to the credit of the United States and in a general deposit account of the United States maintained in that bank, containing general funds of the Government.

32. On August 4, 1950, plaintiff in this case forwarded to the Collector of Internal Revenue at Pittsburgh, Pennsylvania, a check in the amount of $1,-500,000. Accompanying said check was a letter reading as follows:

"The undersigned, executrices of the above estate, enclose herewith our check for $1,500,000 payable to your order. Please deposit the proceeds of this check in your 9–D account. This payment is made in respect of the proposed deficiency in the estate tax of the above decedent which exceeds $2,900,000 exclusive of credit for state, inheritance and estate taxes.

"Neither this letter nor the payment made herewith shall be construed as a consent on behalf of the above estate to the assessment of the proposed deficiency.

"Will you please stamp the enclosed carbon copy of this letter and return it to us together with your receipt for this payment."

This check was deposited and, as requested by plaintiff, the accounting credit was entered in the Collector's 9–D Suspense Account in respect of the proposed deficiency referred to in Paragraph 9 of the Stipulation of Facts heretofore filed. A photocopy of the face and back of such check, attached hereto as "Exhibit B–4", shows that such check was paid on August 9, 1950, into the general deposit account of the United States maintained in the Federal Reserve Bank of Cleveland. The serial numbers "9971361" appearing on the face of such check were stamped thereon by the Collector of Internal Revenue and have the following meanings:

"99"     means Suspense Account.
"7"      means Estate Tax.
"1361"   means that this was the 1361st item credited to the suspense account during the then current accounting period.

33. If a proposed deficiency with respect to which a voluntary remittance had been made was thereafter assessed, the Collector of Internal Revenue would,

after assessment, make the appropriate accounting entries by debiting the suspense account and crediting the assessment account in the name of the taxpayer with a like amount.

34. In the event the remitter requested or demanded a return of the remittance prior to the assessment, if any, of a proposed or recommended deficiency, the Collector was required to initiate action to make such return, or to avail himself of the opportunity of recommending to the Commissioner of Internal Revenue the making of a jeopardy assessment as set forth in Paragraph 35 hereof. As an accounting matter, this would be accomplished by first setting up in the name of the remitter a no-tax assessment account, crediting this account with the amount of the remittance previously credited to the suspense account, and debiting the suspense account in a like amount. This would produce a credit balance in the no-tax assessment account established in the name of the remitter and the amount of such credit balance would be paid to the remitter with a check drawn on the Treasurer of the United States.

35. If it appears to a Collector of Internal Revenue that collection of any proposed tax might be jeopardized by a delay in assessment he can recommend to the Commissioner of Internal Revenue the making of a jeopardy assessment. The jeopardy assessment procedure is not dependent on whether there have been any remittances credited to a suspense account. If the Commissioner of Internal Revenue makes a jeopardy assessment before a remittance credited to the suspense account is returned to a remitter who has requested its return, then the amounts previously credited to the Suspense Account will be credited against that assessment in the manner described in Paragraph 33 herein. The Collector has no right to refuse to return to the remitter the amounts credited to a suspense account in the absence of an assessment, jeopardy or otherwise.

In addition to the facts as stipulated by and between the parties, the Court finds from the stipulation of facts as follows:

36. On August 4, 1950, the plaintiff paid to the Collector of Internal Revenue $1,500,000 which was accepted by the Collector as an advance payment on the proposed deficiency to be assessed.

## Opinion
### Conclusions of Law

In this proceeding the plaintiff is seeking to recover taxes paid by the estate of John W. Hubbard, deceased, for the fiscal years ending May 31, 1949, May 31, 1950, and May 31, 1951, in the principal amounts of $52,537.66, $16,103.92, and $11,536.24, respectively, together with interest thereon. In the alternative, the recovery of $35,513.45 with interest is sought for the fiscal year ended May 31, 1951. It appears that the estate paid a tax of $5,544,670.61.

Plaintiff filed a request with the Commissioner for an early determination of the estate tax liability. The Commissioner determined that there was a deficiency due of $2,300,901.82. Plaintiff contested this deficiency and, thereafter, during the negotiations with the Internal Revenue Service, paid in the sum of $1,500,000 into the Collector's 9–D Suspense Account. Finally on August 24, 1951, a deficiency of $1,524,485.60 was made, agreed to by plaintiff and the Collector less a credit for Canadian succession taxes in the amount of $29,445.62. This was satisfied by the Collector simply debiting the suspense account $1,500,000, and crediting the assessment account, a mere bookkeeping entry. The taxpayer then paid $167,215.34, the balance due on September 6, 1951.

Plaintiff thereafter filed for a refund claiming that since it maintained its books on the accrual system, which is admitted by the Government, that they should be entitled to deduct the interest from the income of the estate. Claims for refund of the Federal income tax were filed; however, the Commissioner rejected the claims.

The estate's primary contention is that the interest accrued ratably over the

fiscal years 1949, 1950, and 1951, on an estate's tax deficiency of $1,495,039.98 finally determined and assessed, and that the estate is entitled to deduct from gross income the amount of interest so accrued for the years. The Government denies that there were any accruals of interest during those years.

The question thus presented to the Court for determination is when does the statutory interest on a deficiency in Federal estate tax accrue and become deductible for Federal income tax purposes by an estate filing Federal income tax returns on the accrual method of accounting?

Internal Revenue Code of 1939 provided that in computing net income there shall be allowed as deductions:

"(b) Interest. All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations * * * the interest upon which is wholly exempt from the taxes imposed by this chapter." 26 U.S.C.A. § 23(b).

"The deductions and credits * * shall be taken for the taxable year in which 'paid or accrued' or 'paid or incurred', dependent upon the method of accounting upon the basis of which the net income is computed, unless in order to clearly reflect the income the deductions or credits should be taken as of a different period * * * ". 26 U.S.C.A. § 43.

Thus, the issue is did the interest on the deficiency accrue ratably during the fiscal years 1949, 1950, and 1951? The Government maintains that it did not. The Government's position is that it accrued in 1952, when the estate tax deficiency was ultimately determined. The estate, of course, maintains that the interest accrued on this deficiency during each of the aforementioned years.

■ It appears from the decisions of the various courts that the liability for the estate tax is fixed at the time of the decedent's death. Boston Safe Deposit & Trust Co. v. Nichols, D.C.Mass.1927,

18 F.2d 660. And the tax upon an estate accrues when the decedent dies. Hodgkins v. Commissioner, 7 Cir., 1930, 44 F.2d 43.

The Government does not seriously contest this; however, the Government urges that the plaintiff here was contesting the deficiency assessed against the estate and that, therefore, there could be no accrual of the liability until the tax was ultimately established. In support of its position, the Government relies on the case of Dixie Pine Products Co. v. Commissioner, 320 U.S. 516, 64 S.Ct. 364, 365, 88 L.Ed. 420, and claims that the deduction here cannot be allowed for the reason that the estate was contesting the liability. The Supreme Court in the Dixie case stated that:

"It has never been questioned that a taxpayer who accounts on the accrual basis may, and should, deduct from gross income a liability which really accrues in the taxable year. It has long been held that, in order truly to reflect the income of a given year, all the events must occur in that year which fix the amount and the fact of the taxpayer's liability for items of indebtedness deducted though not paid; and this cannot be the case where the liability is contingent and is contested by the taxpayer. Here the taxpayer was strenuously contesting liability in the courts and, at the same time, deducting the amount of the tax, on the theory that the state's exaction constituted a fixed and certain liability. This it could not do. It must, in the circumstances, await the event of the state court litigation and might claim a deduction only for the taxable year in which its liability for the tax was finally adjudicated."

■ Under the accrual system an expense would occur when all the events have occurred from which liability is determined, and the liability has become fixed even though payment is not yet due.

In the case such as the one presently before the Court, the liability for the es-

tate tax accrues at the moment of death. Under the accrual system of accounting expenses are said to be accrued when the events have occurred from which liability is determined, and the liability has become fixed, even though payment is not yet due. The basic idea under the accrual system of accounting is that the books shall immediately reflect obligations and expenses definitely incurred without regard to whether payment has been made or whether payment is due. Under this system the use of the word "accrued" does not signify that the item is due. On the contrary, the accrual system wholly disregards due dates. Neither is it necessary that the amount of incurred liability be accurately ascertainable in order to accrue it.

In the instant case every fact or circumstance effecting the amount of the tax had occurred at the time of the death of the decedent, and no fact or event occurring after that date could be a factor in the computation or determination of the tax. On that date liability for the tax became definitely fixed. Neither liability for the tax nor the amount properly payable could be effected under the law by anything that happened after the date of the decedent's death. The fact that a difference of opinion might arise after the date of the decedent's death between the plaintiff, executrix of the decedent's estate, and the Commissioner as to what was the proper amount of tax payable or due really does not provide any new factors occurring after the date of the decedent's death that could vary the tax. Thus, if the executrix did accrue any interest due on the estate tax liability, that might probably have been a proper accounting procedure under the accrual method. However, the estate did not accrue any taxes due on its books. The estate apparently paid the amount of taxes it believed to be due, and requested that the Commissioner make an early determination of the estate tax liability.

On May 15, 1949, an examination of the tax return was begun, and on July 21, 1950, a report in which a deficiency of $2,300,901.82 was proposed. On August 4, 1950, the plaintiff made an advance payment to the Collector in the amount of $1,500,000, which was deposited at plaintiff's request in the Collector's Suspense Account 9–D. On August 28, 1950, a formal protest was filed. Finally on July 9, 1951, plaintiff offered to settle for a net deficiency in the amount of $1,495,039.98. This was accepted and interest was assessed against the estate from September 3, 1948, to August 4, 1950, covering the period from the day following the filing of the estate tax return until the deposit of the $1,500,000, in the Suspense Account.

The balance due was paid. And now plaintiff seeks to offset the interest which it paid on the deficiency in the estate tax ratably against the income of the estate during fiscal years 1949, 1950, and 1951. It is admitted that the accrual method of accounting was used.

Thus, the issue presented to this Court is whether an estate may pay the amount of estate tax it believes due, and then contest the liability as to the amount the Government believes due. Then when the amount of the liability is finally determined, may the estate thereafter offset the interest which accrues on the deficiency found to be due against the estate's income during the period in which the amount of deficiency was being determined? This cannot be done because the estate if it wished to contest the amount of the liability due, it might pay the Collector the amount proposed by the Government and litigate the amount actually due. Should it be successful its money would be returned, and should it be unsuccessful obviously no interest would be assessed against it for the time of the litigation.

The plaintiff here did not pay any money into the Commissioner's accounts until 1950, after which no interest was ever assessed against it. But it seeks to deduct the interest that accrued during the time of the contest from its income. If this were permitted, then no one would have to pay any money into the Commissioner's suspense accounts to avoid payment of interest. One would merely have

to litigate and negotiate towards a final determination of the tax. Once the tax was determined, then the plaintiff or litigant could offset the interest on this amount against its income for the year or years and reach the same result of not having to pay any interest, the same as if it paid the money originally into a suspense account. It appears to this Court that this would defeat one of the purposes of the law. Thus, we will follow the rule of the Dixie Paper Products Company case and deny plaintiff's claim for refund during the years 1949, 1950, and 1951.

■ The plaintiff contends in the alternative that the interest on the deficiency assessment accrued not later than August 4, 1950, the date on which $1,500,000 was paid to the Collector, and at plaintiff's request deposited in the Collector's Suspense Account 9–D.

Plaintiff contends that though they are contesting the tax, the interest thereon is accruable and deductible not later than the time of payment. The Government on the other hand, while not really contesting this as a principle of law, takes the position that what the plaintiff did was make a mere deposit and not a payment, and what was done the Government maintains is that a deposit in the nature of a cash bond was made for the payment of taxes thereafter found to be due and was not a payment of the tax.

The Court of Claims in Chestnut Securities Co. v. United States, 1945, 62 F. Supp. 574, 576, stated:

"We think the Government is wrong. One is not entitled to accrue a debt or other liability which is asserted against him but which he disputes and litigates, until the litigation is concluded. But if a liability is asserted against him and he pays it, though under protest, and though he promptly begins litigation to get the money back, the status of the liability is that it has been discharged by payment. It is hardly conceivable that a liability asserted against him, which he has dis-

charged by payment, has not yet 'accrued' within the meaning of the tax laws and the terminology of accounting. Accrual, from the debtor's standpoint, precedes payment, and does not survive it."

The issue as we see it is whether the remittance of $1,500,000 on August 4. 1950, and the crediting by the Collector of his Suspense Account 9–D, was a payment and thus the tax accruing at that date, or did the tax accrue on August 24, 1951, when a net agreed deficiency was assessed. The Government's position as set forth in its brief is merely that the remittance on August 4, 1950, was a mere deposit, and not a payment, and that it was really a deposit in the nature of a cash bond for the payments thereafter found to be due. However, the Court must determine exactly what the remittance of August 4, 1950, was by an examination of the facts presented to it, and cannot determine what this was by arguments of the parties in their briefs.

We naturally are bound to follow what we believe to be the principles laid down by the Supreme Court of the United States. However, for the purpose of the instant case only, the Government and the plaintiff have agreed on an additional stipulation of facts relating solely to Suspense Account 9–D, and the meaning of the remittance sent to the Government by the plaintiff must be determined under this agreed stipulation of facts. The Supreme Court in Rosenman v. United States, 323 U.S. 658, 65 S.Ct. 536, 89 L. Ed. 535, apparently found that the money in its accounts was held not as taxes duly collected, but as a deposit made in the nature of a cash bond for the payment of taxes thereafter found to be due in the light of a Ruling Of the Comptroller General, A–48307, April 14, 1933. Our view of this is buttressed by Judge Harlan, now Mr. Justice Harlan's decision in Lewyt Corporation v. Commissioner of Internal Revenue, 2 Cir., 1954, 215 F.2d 518, 522.

The Ruling of the Comptroller General referred to is not a part of the stipulation by which we are to determine the ef-

fect of the payment of the $1,500,000, and its consequent deposit in the Suspense Account 9–D. The plaintiff and the Government agree that the effect and operation of a deposit in this suspense account at this time and in this case shall be interpreted in the light of the additional stipulation of facts which they filed including Exhibits B–1, B–2, and B–3. A careful reading of these exhibits indicates no reference to the Ruling of the Comptroller General, A–48307. Therefore, for the purpose of this case, it is the opinion of this Court that in the light of the additional stipulation of facts and the exhibits attached thereto, that the remittance to the Collector of $1,500,000, was a payment.

While the body of the additional stipulation carefully avoids the word "payment", the primary supporting paper is Exhibit B–1 which is an instruction issued on August 23, 1927, by D. H. Blair, Commissioner of Internal Revenue, dealing with the use of 9–D Suspense Accounts. From an entire reading of the letter of August 23, and the supporting papers, it is clear to this Court that the payment made by the plaintiff on August 4, 1950, was an advance payment. In support of this, it is obvious from the stipulation that while the remitter might request a return of the remittance prior to an assessment, it is wholly within the power of the Collector of Internal Revenue to refuse the return by the filing of a jeopardy assessment. Therefore, the remittance on August 4, 1950, did constitute a payment of the estate tax liability, and there was an accrual of the tax on August 4, 1950. In addition it is of interest to note that on August 28, 1951, the Collector issued a statement of Federal Estate Tax due in which the following phrase is used: "Payment made 8–4–50, $1,500,000.00," indicating that the Collector then thought that it was in payment.

The Court having found that the tax did accrue on August 4, 1950, the plaintiff is entitled to recover under its alternative claim in the sum of $35,513.45, plus interest. This opinion shall also serve as the Court's Conclusions of Law. An appropriate order will be entered.

Treasury Department

Office of Commissioner of Internal Revenue

Washington, D. C.

August 23, 1927.

A&C Mimeograph
Coll. No. 3564

Acceptance of Payments Covering Proposed Additional Income Tax Assessments

Collectors of Internal Revenue:

It has been brought to the attention of the Bureau that some Collectors have refused to accept advance payments submitted by taxpayers covering additional taxes proposed in reports of Internal Revenue Agents prior to the time such taxes are assessed.

It is advantageous both to the Government and to the taxpayer that any moneys tendered in payment of proposed additional assessments be accepted and deposited without delay. A suspense account (Account 9d) has been provided for the use of Collectors in which to carry such advance payments pending the receipt of the list or lists containing the assessments. Collectors are, therefore, directed to accept all remittances tendered by taxpayers in payment of proposed deficiency assessments, and to promptly deposit same as internal revenue collections, holding the amounts in Account 9d pending assessment by the Bureau or by the Collector under the provisions of Com. Mimeograph Coll. No. 3552.

Inquiries regarding the instructions contained in this mimeograph should refer to the symbols A&C:Col.

D. H. Blair,
Commissioner.

"Exhibit B–1"

Treasury Department

Office of Commissioner of
Internal Revenue

Washington, D. C.

July 6, 1927.

Com. Mimeograph
Coll. No. 3552
R. A. No. 423

Assessment of Income Tax Deficiencies
in Cases where Agreements are
Secured or Payments Voluntarily
Made.

Collectors of Internal Revenue and
Internal Revenue Agents in Charge

1. In order to expedite the assessment of deficiencies of income tax where the returns have been sent to Internal Revenue Agents for audit or investigation, the following procedure is hereby made effective immediately:

2. When an agreement is tendered by the taxpayer consenting to the immediate assessment of a deficiency, the return with all related papers shall be forwarded by the Internal Revenue Agent in Charge with a letter of transmittal on Form 884 to the Collector of Internal Revenue in whose office the return was originally filed.

3. Upon receipt of the return the Collector will list the amount of the deficiency upon his current monthly supplemental assessment list. There shall also be assessed with the tax interest at the rate of ½ of 1% per month in accordance with the provisions of the Revenue Act applicable to the particular taxable year involved. The interest will terminate as of the date of the assessment or thirty days after the filing of the waiver, whichever is earlier. The tenth day of the month following that to which the assessment list relates will be considered as the date of assessment. It is expected that deficiencies of this class will be assessed before thirty days have expired after the filing of the waivers and that interest will, therefore, be computed to the dates of assessment.

4. Before sending the returns to the Collectors, the Agents in Charge will imprint thereon the audit stamp (which will be furnished them). This stamp will be placed in the space provided therefor in the upper left corner of the return. The Agents will indicate in the proper spaces of the assessment stamp the amount by whom audited and the date. The Collectors will complete the audit stamp by showing the amount of interest and the total of the tax and interest. The Collectors will also show in the assessment stamp the particularly monthly list and the account number under which the deficiency assessment is listed. The tax and interest should be listed separately on Form 23-A but will be set up on the same account. Collectors will also show in the remarks column of the list, opposite each deficiency assessment, the taxable year and the account number assigned to the original return.

"Exhibit B–2"

5. In case the Collector receives a voluntary remittance from a taxpayer in payment of a proposed deficiency, he will immediately inform the Internal Revenue Agent in Charge and request the appropriate return and related papers. Upon receipt of the documents in the case, the Collector should list the deficiency for assessment in accordance with the procedure outlined in the preceding paragraph. The receipt of the remittance will be construed as an agreement. In cases of this kind, interest at the rate of ½ of 1% per month shall be assessed with the tax. Such interest will run to the date of payment. If the full amount of the interest is not included with the remittance, the Collector will immediately bill the taxpayer for the amount of the shortage. Returns of this class should also have the Agent's audit stamp imprinted thereon with the appropriate spaces filled in.

6. A new series of numbers running from 51,000 to 51,999 for individuals and from 52,000 to 52,999 for corporations has been assigned to the class of assessments mentioned herein. Collectors will

assign account numbers falling in the new series to this class of deficiency assessments.

7. All income tax returns forwarded to Collectors by Agents in Charge for the assessment of deficiencies in the manner described herein will be sent to the Income Tax Unit of the Bureau by Collectors with the assessment lists.

8. In case an Internal Revenue Agent makes one investigation covering the returns for several taxable years and if such investigation results in deficiencies for some years and overassessments for other years, the instructions contained herein will not be applicable, even though agreements are secured. Cases of this nature will be transmitted by the Agents to the Income Tax Unit of the Bureau in accordance with the procedure heretofore in effect.

9. There is attached hereto and made a part of this mimeograph a set of the Bureau's rules for computing interest on deficiencies. Collectors should make a careful study of these rules and apply them to the work of computing interest items to be listed in accordance with the instructions contained herein.

10. All previous instructions in conflict with this mimeograph are revoked as of this date.

11. Inquiries from Collectors in regard to the procedure outlined herein should be addressed to the Commissioner and should refer to the symbols A&C: Col. Inquiries from Internal Revenue Agents in Charge relative to this procedure should refer to the symbols IT:E:-CRN.

H. F. Mires,
Acting Commissioner.

Treasury Department

Office of Commissioner of
Internal Revenue

Washington, D. C.

February 15, 1939.

Com.–Mimeograph
Coll. No. 4883
Coll. No. 957
T. S. No. 18

*Voluntary Payments Submitted by Taxpayers in Connection with Deficiencies in Taxes (Supplemental to Com. Mim. Coll. No. 3552. Amended, R. A. No. 423, Amended, T. S. No. 14).*

Collectors of Internal Revenue

Internal Revenue Agents in Charge. Heads of Field Divisions of the Technical Staff, and Other Officers and Employees of the Bureau of Internal Revenue Concerned:

1. Paragraph 22 of Com.-Mimeograph Coll. No. 3552, R. A. No. 423, T. S. No. 14, amended under date of January 18, 1939, reads as follows:

"22. When the Collector receives a voluntary remittance from a taxpayer in payment, in whole or in part, of a proposed deficiency, (whether submitted before or after the issuance of a ninety-day letter or after a petition to the Board of Tax Appeals or to the Circuit Court has been filed) he will deposit the remittance in the usual manner and hold the credit in the appropriate suspense account. The collector will immediately send a letter to the internal revenue agent in charge describing the payment and requesting the appropriate return and related papers. The internal revenue agent will then certify the case to the collector who will list the deficiency on the appropriate current assessment list. If, however, the amount of the remittance is but a portion of the deficiency recommended by the agent, or if for some other reason the file cannot be forwarded, the internal revenue agent in charge will immediately advise the collector accordingly."

2. It has come to the attention of the Bureau that, in some instances, remittances covering proposed deficiencies in taxes have been forwarded by taxpayers to Collectors' offices, and the closing of the cases has been unnecessarily delayed and the taxpayers unduly annoyed by failure of the Collector to promptly notify the appropriate Internal Revenue Agent in Charge. The procedure contemplates that the Agent in Charge will

be promptly notified by the Collector upon receipt of a remittance submitted in payment of a proposed deficiency in tax, and that the Agent will, upon receipt of such advice, transmit the file immediately to the Collector for listing of the assessment. In order that there may be a uniform procedure for handling cases where voluntary payments have been made to Collectors, the following instructions will hereafter be observed by Collectors and Revenue Agents in Charge.

#### "Exhibit B–3"

3. Upon receipt of a remittance by the Collector apparently intended to cover a proposed deficiency in income, profits, estate, gift or unjust enrichment taxes which has not been assessed, the remittance will be deposited in the usual manner and credited to the appropriate unclassified or suspense account. A form of notice of remittance to the Internal Revenue Agent in Charge, similar to the attached form, will be prepared in triplicate. The original and triplicate will be transmitted to the Agent in Charge and the duplicate copy will be retained by the Collector and used as a voucher to the credit held in the Suspense Account. A supply of these forms should be mimeographed in each Collector's office sufficient for its requirements. While this form is drafted in order that it may be filed in the ordinary 5x8 filing cabinet, there will be no objection to the use of full size letter paper in preparing the notices if experience demonstrates that additional information on the form is necessary.

4. Where the Collector receives a remittance without any accompanying evidence to show that it is intended to cover a proposed deficiency in taxes but where it appears that the money is submitted in satisfaction of income, profits, estate, gift or unjust enrichment taxes, and the records of the Collector fail to show any outstanding taxes in the name of the taxpayer, the amount of the remittance will be held in the appropriate suspense account and the Agent in Charge notified in the manner herein provided. It is not

desired that the Collector notify the Agent in Charge of purely unidentified remittances, that is, remittances which are received unaccompanied by any letter, document, or evidence to show the kind of tax involved, but only where the Collector has reason to believe that the payment may be intended to cover income, profits, estate, gift or unjust enrichment taxes should the Agent be notified.

5. Upon receipt of the forms, the Internal Revenue Agent in Charge will promptly make a check of his suspense files to determine if there is a case pending in connection with the item reported by the Collector. If there is a case pending, the Agent in Charge will forward the file to the Collector accompanied by the triplicate copy of the Collector's notice of remittance. If, however, the amount of the remittance is but a portion of the deficiency recommended by the Agent or if for some other reason the file cannot be forwarded, the Internal Revenue Agent in Charge will immediately return the notice of remittance with advice as to why the file is not being forwarded. The original copy of the notice will be retained in the Agent's files. The receipt of the case by the Collector with his notice of remittance will indicate to the Collector that the payment has been received and is held in the suspense account. In case the Agent in Charge fails to find a case pending in connection with the Collector's notice of remittance, he will make a notation "No Record" across the face of one copy of the notice and return it at once to the Collector. In the latter event, the Collector will then take such further steps as may be deemed necessary to ascertain the purpose for which the remittance was tendered.

6. There may be instances where remittances will be received by the Collector before the report of the examining agent is received in the office of the Agent in Charge and, for this reason, there may be delay on the part of the Agent in Charge in forwarding the file to the Collector. In such cases; if there

will be any appreciable delay, the Collector should be notified by the Agent that the file will be transmitted as soon as the report is completed.

7. Correspondence from Collectors in regard to the foregoing instructions should refer to the number of this mimeograph and to the symbols A&C:Col. Inquiries from Internal Revenue Agents in charge relative thereto should refer to the number of this mimeograph and to the symbols IT:F.

Guy T. Helvering,
Commissioner.